## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**LORETTA L. SMITH,**

      **Plaintiff,**

v.                                **Civil Action No. 5:12CV98**
                                       **(The Honorable Frederick P. Stamp)**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner") denying Loretta L. Smith's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and have been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Loretta L. Smith ("Plaintiff") filed an application for DIB on February 14, 2011, alleging her onset date was October 1, 2010, and alleging disability due bipolar disorder, depression, and anxiety (R. 131, 165). Plaintiff's applications were denied at the initial and reconsideration levels (R. 75-76). Plaintiff requested a hearing, which Administrative Law Judge Mark M. Swayze ("ALJ") held on April 12, 2012 (R. 21). Plaintiff, represented by a non-attorney representative, Jennifer LaRosa, testified on her own behalf (R.21-59). Also testifying was Vocational Expert Larry Ostrowski ("VE") (R. 59-68 ). On April 16, 2012, the ALJ entered a decision finding Plaintiff was not disabled

(R. 9-20). Plaintiff timely filed a request for review to the Appeals Council (R. 129 ). On May 22, 2012, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-5).

## II. FACTS

Plaintiff was born on November 17, 1972, and was thirty-nine (39) years old at the time of the administrative hearing (R. 131). Plaintiff completed three (3) years of college and had past relevant work as a licensed practical nurse and a registered nurse (R. 37, 157, 166).

In conjunction with filing for benefits with the Social Security Administration, Plaintiff completed a Function Report - Adult (R. 172-79).[1] Plaintiff wrote that she experienced depression and anxiety, which caused an "inability to deal with stress at work." Plaintiff wrote she was unable to sleep, concentrate, and focus. She had no energy when she was depressed; she cried (R. 172). Plaintiff would "just sleep when not working." She sat "around" or "stay[ed] in bed." She had no interest in "anything and everything [was] a task." Plaintiff wrote she helped her children with their baths and homework. She did laundry, prepared dinner, bathed the dog, and "sometimes" fed the dog. Plaintiff wrote that her husband helped her bathe the children and assist her with helping them with their homework. Plaintiff noted her husband assisted her with the preparation of dinner and completing the laundry. Plaintiff's husband did "most of the running here and there." To the question, "What were you able to do before your illness, injuries, or conditions that you can't do now?," Plaintiff responded, "It is a task for me to get up - make it through the day, get a shower and do what I can for kids/house, etc." Plaintiff wrote that "all [she wanted] to do [was] sleep . . .

---

[1]Plaintiff did not date the report. She wrote her birth date in the portion of the form that was designated for the date the report was completed (R. 179).

sometimes." She took medication to go to and stay asleep. Plaintiff had "no problem" with caring for her personal needs. She could dress herself, bathe herself, care for her hair without help, shave without help, go to the bathroom unassisted, and feed herself (R. 173).

Plaintiff wrote that her husband primarily prepared meals; however, she prepared meals when he worked or when he was busy. Plaintiff wrote she did not have a "desire to cook." She would rather not eat "if kids [weren't] home." Plaintiff reported she cleaned, did laundry and washed dishes "whenever not depressed and have the energy." She cleaned for "30 minutes or so - laundry [did] 2-3 loads in one day then none for 2-3 days (pick up after kids but not major cleaning often)." Plaintiff wrote that she needed "encouragement and help." Plaintiff noted that "everything [was] a conscious effort out of guilt of obligation." She never got "fixed up." She felt she had "no purpose" and did not want to "deal with people." Plaintiff did not "go to grocery store or Walmart" (R. 174). Plaintiff noted she did "some house work out of guilt or obligation – whenever" she could "talk" herself "in to (sic) it." Plaintiff wrote she rarely went outside due to stress, anxiety, her not having "the energy to get dressed and go," and her not "want[ing] to see people" she knew because she felt "worthless." Her husband "mostly" drove; she drove when he was not available to do so. Plaintiff wrote she shopped about once monthly for household items and "hygeine (sic) stuff"; her husband "mostly" shopped. Plaintiff could pay bills, count change, handle a savings account, use a checkbook, and make money orders; however, Plaintiff noted her husband "mostly" paid bills (R. 175). She did not have the "energy to think about" paying bills. Plaintiff wrote, relative to bill paying, that "ignorance [was] bliss[;] therefore[,] I'm not responsible." Plaintiff wrote that she used to crochet and watch certain television programs. She no longer had "much interest anymore" and "rarely" engaged in these activities. Plaintiff wrote she "mostly use[d] [her] energy to stay functional

3

and interact [with] kids, fold load of clothes or something." She "hate[d] phone" and was "never on computer." Plaintiff "rarely" talked to family. Plaintiff wrote she needed reminded to go places and someone to accompany her when she did go anywhere (R. 176).

Plaintiff wrote that she had "problems getting along with family, friends, neighbors or others" in that she was "usually depressed – [took] everything people [said] to heart and [cried] or [got] mad – [could not] deal with people, stress, or coworkers." Plaintiff had the following changes to her social activities since the onset of her symptoms: "no desire to go anywhere or do anything – don't want to be around family – missed thanksgiving (sic) + Christmas get together – missed kids (sic) Christmas program. Can't be around people. Scared of something happening if I'm out a lot (sic). Safer at home." Plaintiff noted her memory and concentration and abilities to complete tasks, follow instructions, and get along with others were affected by her conditions. She further explained that "when [she was] depressed – no energy – conscious effort to bath (sic) myself – have trouble concentrating, completing task, bad memory – [could not] deal with others due to stress/anxiety/feeling inferior." Plaintiff's response to the questions, "For how long can you pay attention?" was "[I]t varies, with racing (sic) thoughts and high anxiety not long." Plaintiff did not finish what she started because she lost interest. Plaintiff wrote she was "ok" at following a written instruction in that she "read it one step at a time." She followed spoken instructions "'okay'" "if no interruptions" (R. 177). Plaintiff noted she got along "good' with authority figures. She had been fired from a job after seven (7) years "due to depression/anxiety/inability to deal with others." Plaintiff did not work for "over a year then worked 3-4 weeks at different job" and was "fired" because she "couldn't make [herself] go!!!" Plaintiff was then "off medical leave [from her] last job." Plaintiff wrote she could not handle stress because she cried, became angry and depressed, and

4

then could not function. Plaintiff wrote she did not "handle changes in routine . . . well." Plaintiff

wrote that "after [her] mom had 3 siblings die [she] had fear of dying – leaving [her] kids and thats

(sic) when [she] became severly (sic) depressed and didn't leave for over a year and kept [her] kids

as close as possible" (R. 178). Plaintiff reported she medicated with trazodone, which made her

"growgy (sic), nausea (sic)"; Prozac, which caused nausea; and Klonopin, which caused sleepiness.

In the section of the questionnaire in which Plaintiff was to write information she did not include in

earlier section, Plaintiff wrote the following:

> I have been depressed off and on since I was 14. It was really bad when I was a
> senior in High (sic) school. I have been anorexic. I was first treated at age 20. When
> I weighed 88#s (sic). Since then[,] I have been treated by several Dr's (sic) and with
> several meds. I have often self medicated with Benadryl for sleep and caffein (sic)
> for energy. However, I don't know if its (sic) because of age, time, or circumstances,
> the periods of depression/anxiety are closer together, lasting longer, and more intense
> the last couple of years. This year being the worst (sic). Being suicidal and deciding
> that my kids would be better off without me (sic). Over the past 4 years, I have
> became (sic) nonfunctional and[,] if working[,] had to take a leave because I was
> unable to function. I have now lost my last 3 jobs and feel it is impossible for me to
> work (R. 179).

On March 29, 2010, Plaintiff reported to the Davis Memorial Hospital Emergency

Department with complaints of bleeding. She was nine (9) weeks pregnant (R. 204). She medicated

with an antibiotic, Monistat, and Klonopin. Plaintiff was not light headed or dizzy. Plaintiff had an

ultrasound, which showed "no evidence of intrauterine pregnancy" (R. 205, 209). Plaintiff was

prescribed Vicodin and released to home (R. 205).

Plaintiff presented as a new patient at Life Reflections, LLC, on October 1, 2010, to begin

counseling with Michael McCauley. She reported Dr. Roberts had prescribed Wellbutrin and

Klonopin. Plaintiff reported she had a history of anorexia, migraine headaches, and depression. In

response to the question, "Have you ever been hospitalized for substance abuse, alcoholism, eating

disorders, or other psychiatric disorders?," Plaintiff wrote, "Humm???" (R. 233). The focus of the counseling session with Mr. McCauley was "multitude of family stress: health, finances, job, custody, hx of depression, anorexia." Mr. McCauley found Plaintiff's dress was normal, motor behavior was normal, speech was excessive, flow of thought was normal, mood and affect were labile, and behavior during session was impulsive. Mr. McCauley found Plaintiff's energy level was high; insight was good; and judgment was fair. Mr. McCauley diagnosed "296.3."[2] Mr. McCauley's treatment plan was for Plaintiff to "improve communication & problem solving"; "improve stress management"; and "reduce impulsive decisions" (R. 232).

On October 4, 2010, Plaintiff reported to Dr. Roberts that she had "just stopped Wellbutrin" as it provided "no help." Plaintiff stated she had migraine headaches, vomited occasionally, was depressed, felt stressed, was overwhelmed, and had suicidal ideations. Dr. Roberts prescribed Prozac and Klonopin (R. 211).

It was noted that Plaintiff did not attend her October 7, 2010, counseling session with Mr. McCauley; her husband phoned and reported she had overslept. On October 8, 2010, Plaintiff telephoned Mr. McCauley's office and reported, "PC to my house: home situation remains tense" and scheduled a counseling appointment for October 11, 2010. She was encouraged to bring her husband to that session (R. 232).

Plaintiff participated in counseling with Mr. McCauley on October 11, 2010. The focus of the session was "poor communication w/husband; hx of trauma & secondary trauma in workplace."

_____

[2]296.3: The diagnostic codes for Major Depressive Disorder are selected as follows: 1. The first three digits are 296. The fourth digit is either 2 (if there is only a single Major Depressive Episode) or 3 (if there are recurrent Major Depressive Episodes). . . . *Diagnostic and Statistical Manual of Mental Disorders*, 4th Ed., 1994, at 340.

Mr. McCauley found Plaintiff had normal dress and motor behavior, excessive speech, tangential flow of thought, anxious mood and affect, and impulsive behavior during the session. Plaintiff's energy level was high; her insight was good; her judgment was fair. Mr. McCauley diagnosis was "296.3." His treatment plan was to "process trauma hx." Plaintiff was to "improve communication w/husband"; "reduce impulsive decisions"; and "improve stress management" (R. 231).

On October 14, 2010, Plaintiff participated in counseling with Mr. McCauley. The focus of the session was "work stress; understaffed, hyper responsible." Mr. McCauley found Plaintiff's dress was normal, motor behavior was fidgety, speech was excessive, flow of thought was normal, mood and affect were labile, and behavior during session was impulsive. Plaintiff's energy level was high, insight was fair, and judgment was good. Mr. McCauley diagnosed "296.3," and his treatment plan was for Plaintiff to "improve stress management"; "improve self care"; "process trauma & affect or present"; and "improve communication & problem solving with husband" (R. 230).

Plaintiff participated in counseling with Mr. McCauley on October 19, 2010. Mr. McCauley noted Plaintiff had a history "of trauma – expectation of bad things happening." He found Plaintiff's dress was normal; motor behavior was normal; speech was excessive; flow of thought was normal; mood and affect were anxious; and behavior during the session was impulsive. Mr. McCauley found Plaintiff's energy level was high, insight was good, and judgment was fair. Mr. McCauley diagnosed "296.3," and his treatment plan was for Plaintiff to increase stress management, "improve self care," "process trauma," and "improve communication & problem solving" (R. 229).

On October 20, 2010, Plaintiff reported to Dr. Roberts that she had a "melt down" and increased stress at work due to the death of an infant. She was unable to sleep and had migraine headaches. Dr. Roberts found Plaintiff had PTSD and was anxious. He diagnosed depression and

instructed Plaintiff to continue counseling. He prescribed Prozac and Klonopin. Dr. Roberts noted Plaintiff needed a leave of absence "for 4 weeks for counciling (sic) till 11/22/10" (R. 212).

On October 25, 2010, Plaintiff reported to Mr. McCauley that she was "dealing with marital stress." Mr. McCauley found Plaintiff's dress was normal, motor behavior was normal, speech was normal, flow of thought was tangential, mood and effect were anxious, and behavior during the session was normal. Her energy level was high, insight was good, and judgment was fair. Mr. McCauley diagnosed "296.3"; his treatment plan was for Plaintiff to "increase time spent as a couple"; decrease "impulsive decisions"; and "improve stress management" (R. 228).

On November 1, 2010, Plaintiff participated in counseling with Mr. McCauley. Plaintiff reported she was not working and was "dealing with home stress." Mr. McCauley found Plaintiff had normal dress, fidgety motor behavior, excessive speech, tangential flow of thought, normal mood and affect, and impulsive behavior during the session. Her energy level was high, insight was good, and judgment was fair. Mr. McCauley diagnosed "296.3"; his treatment plan was for Plaintiff to "deal w/stress more effectively" and "improve communication & problem solving" (R. 227).

During Plaintiff's November 9, 2010, counseling session with Mr. McCauley, he found her dress and motor behavior to be normal. Plaintiff's speech was excessive. Her thought flow was normal. Plaintiff's mood and affect were depressed and anxious. Plaintiff's behavior during the session was normal. The focus of the session was "step parenting; dealing with stress – 'reframing.'" Mr. McCauley diagnosed "296.3"; his treatment plan was for Plaintiff to improve her "ability to cope with stress – challenging, reframing" and to "improve communication & [problem] solving" R. 226).

On November 19, 2010, Plaintiff presented to Dr. Roberts for a follow-up examination for her depression symptoms. She reported she had been on call at work since October 22, 2010; she

had been granted a leave of absence from her job from November 11 to December 11, 2010. Plaintiff reported her "problems started 8/25/10." She stated she was being counseled by Mike McCauley twice a week. Dr. Roberts found Plaintiff had insomnia, anxiety, and depression. He prescribed Prozac and trazodone (R. 213).

Plaintiff participated in counseling with Mr. McCauley on December 2, 2010. He found Plaintiff's dress and motor behavior were normal. Her speech was excessive. Her flow of thought was "perseverance." Her mood and affect were depressed. Her behavior during the session was negative. Mr. McCauley found Plaintiff's energy level was low; her insight and judgment were fair. The focus of the session was "feeling empowered @home; poor communication." Mr. McCauley diagnosed "296.3." The treatment plan was for Plaintiff to "improve ability to cope with stress"; "improve communication & problem solving"; and "increase sense of [respect] for self" (R. 225).

Plaintiff's dress and motor behavior were normal; her speech was excessive; her flow of thought was tangential; her mood and affect were anxious; and her behavior was impulsive during her December 7, 2010, counseling session with Mr. McCauley. Plaintiff' energy level was high, insight was fair, and judgment was good. The focus of the session was "lack of consistency with children" and "perspective and follow through." Mr. McCauley diagnosed "296.3"; his treatment plan was for Plaintiff to "improve ability to cope with stress" and "improve communication & problem solving re: parenting, $" (R. 224).

Plaintiff participated in counseling with Mr. McCauley on December 14, 2010. The focus of the session was "unresolved grief re: father (1998); balance in relationship." Plaintiff's dress and motor behavior were normal, speech was excessive, flow of thought was tangential, mood and affect were anxious, and behavior during session was impulsive. Plaintiff had high energy, fair insight, and

good judgment. Mr. McCauley diagnosed "297.3"; his treatment plan was for Plaintiff to "improve ability to cope with stress"; "[reduce] impulsivity"; and "improve [problem] solving" (R. 223).

Plaintiff participated in counseling with Mr. McCauley on January 4, 2011. The focus of the session was "resentments from past." Plaintiff's dress was normal, motor behavior was fidgety, speech was excessive, flow of thought was "perseverance," mood and affect were irritable, and behavior during the session was demanding and negative. Plaintiff's energy level was average; her insight and judgment were fair. Mr. McCauley diagnosed "296.3"; his treatment plan was for Plaintiff to "develop realistic expectations of others" and "manage moods more effectively" (R. 222).

On January 25, 2011, Plaintiff participated in counseling with Mr. McCauley. He noted Plaintiff had normal dress, normal motor behavior, excessive speech, tangential flow of thought, labile mood and affect, and impulsive and negative behavior during the session. Plaintiff's energy level was high, insight was good, and judgment was fair. The focus of the session was "frustration with family, inability to accept limitations"; the diagnosis was "296.3"; and the treatment plan was "develop realistic expectation of others" and "manage moods more realistically" (R. 221).

On January 29, 2011, Plaintiff presented to Dr. Roberts with complaints of anxiety and depression. Plaintiff was pregnant. Dr. Rogers ordered prenatal laboratory tests. He found Plaintiff was depressed and anxious; she had insomnia (R. 210).

On February 10, 2011, Dr. Goodykoontz, wrote a letter, addressed to no one, that read Plaintiff was "under my care is (sic) suffering from a severe mood disorder and needs to be off from work for an indefinite period of time. She is unable to be employed at this time. . ." (R. 234).

On May 3, 2011, Thomas Stein, Ed.D., completed a consultative Adult Mental Profile of Plaintiff. Plaintiff reported she was pregnant; her due date was September 11, 2011. Plaintiff's

spouse drove and accompanied her to the evaluation. She was cooperative, polite and subdued. Plaintiff's chief complaint was "recurrent, severe depression. It usually starts in the fall. Despite medicines and regular therapy, my depression gets so bad that I can't do my work as a nurse. I've terrible suicidal thoughts all the time. Also, I've lots of anxiety. My problems are all psychological" (R. 235). Plaintiff reported she lived with her spouse and had children aged fourteen (14), eight (8), seven (7), five (5), and two (2) who lived in the house; her seventeen (17) year old stepson lived at the home on weekends. Plaintiff reported she had "zero income" (R. 236).

Plaintiff reported the following symptoms: difficulty falling asleep; frequent waking; four (4) or five (5) crying episodes per week; poor energy level; depressed mood; recent and past suicidal ideations but no plan; "phobic of 'people'"; two (2) panic attacks per month; and compulsive behaviors that included ordering, exact positioning, checking, and counting. Plaintiff reported she was "previously traumatized by child and adolescent sexual abuse" and was "presently affected by those experiences with a 'diminished capacity for intimacy with . . . spouse'" (R. 236).

Plaintiff had been hospitalized at age seventeen (17) for anorexia. Plaintiff reported she was currently receiving outpatient mental health treatments "where she [saw] a psychiatrist once per month for medication management and she [saw] a counselor twice per week for counseling services." Plaintiff stated she had been treated for depression and anxiety from the age of twenty (20) to the present date. She medicated with Prozac, Klonopin, trazodone, and Phenergan. She denied alcohol or drug abuse. Dr. Stein reviewed Mr. McCauley's counseling notes (R. 236).

Plaintiff reported she worked as a nurse at Davis Memorial Hospital from March, 2000, to July, 2008; she was fired for "'[p]oor job performances they said.'" Plaintiff then worked from November, 2009, to February, 2011, at St. Joseph's Hospital. She commenced a medical leave on

October 14, 2010, from the St. Joseph's job; she was informed in February, 2011, that "they considered her resigned" because she did not return to work from that medical leave (R. 237).

As to Plaintiff's development and social history, she reported she was the third eldest of four (4) children; her father retired from the military, had been a security guard, and died of cancer at age sixty-two (62). Her mother was a homemaker. She had been married for fourteen (14) years; she and her husband had five (5) children and were expecting a sixth; she had one (1) stepson (R. 237).

Upon mental status examination, Dr. Stein found the following:

Appearance: The claimant presented casually dressed, neat and clean with adequate posture and adequate gait. . . . She is 5 feet 4 inches tall and reports weighing 160 pounds. Attitude/Behavior: This claimant is cooperative, polite, and subdued. Social: This claimant is cooperative, polite, and subdued. She maintains good eye contact and evidences adequate length and depth with all of her verbal responses. No sense of humor was displayed, although there was some spontaneous generation of conversation. She appeared to be introverted with average conversational skills. Speech: Speech was relevant, coherent, and normal paced. Orientation: This claimant was oriented well to time, place, person, and date. Mood: Depressed. Affect: Subdued. Thought Process: No thought processing disturbances were noted. Thought Content: No delusions, preoccupations, obsessions, or phobias were noted. Perceptual: No hallucinations or illusions were noted. Insight: Adequate. Judgment: Average. Suicidal/Homicidal Ideation: She admits to ideations in the past as well as recently. She denies previous attempts and further denies having a current plan. When all factors were considered, she is felt to presently pose mild risk for suicide. When all factors were considered, the claimant is not felt to pose present risk for assault or aggressiveness towards others. Immediate Memory: Within normal limits, based upon the ability of the claimant to recall four of four items. Recent Memory: Within normal limits, based upon the ability of the claimant to recall three of four items. Remote Memory: Mildly deficient, based upon the ability of the claimant to recall three of four items. Concentration: Average based on serial 7's. Psychomotor Behavior: None (R. 237).

Dr. Stein found the following: Plaintiff was "cooperative, polite, subdued, moderately depressed, and mildly anxious with average intelligence, concentration, judgment, memory and insight." He diagnosed major depressive, recurrent, without psychotic features, and posttraumatic

stress disorder ("PTSD"), chronic, with mild symptoms. Plaintiff's prognosis was fair (R. 238).

Plaintiff reported her activities of daily living as follows: rose at 10:00 a.m.; cared for her personal hygiene without assistance; dressed; fed her youngest son who was at home; watched television; washed dishes; "straighten[ed]" the house and the kitchen; washed laundry; napped for ninety (90) minutes; "chat[ted] with her children as they returned home from school; supervised her children's homework; started preparing dinner; ate with the family; supervised bath and bedtime routines of her children; "check[ed] with her spouse"; took a shower; and retired at 10:30 p.m. Plaintiff then reported that she "rarely" cooked and "occasionally" cleaned, washed dishes, and washed laundry. She did not work in the yard, and she rarely gardened. Plaintiff reported she rarely shopped for groceries, ran errands, or drove. Plaintiff stated she did not walk or read; she occasionally sat on the porch. Plaintiff rarely attended church, ate in restaurants, or visited or socialized with her friends or relatives. She got along well with her spouse. She was not a member of clubs; she did not attend meetings (R. 238).

Dr. Stein found Plaintiff was mildly deficient in her social interactions (R. 238). Her concentration was within normal limits; her persistence was mildly deficient; her pace was moderately slow. Dr. Stein found Plaintiff could manage her financial affairs (R. 239).

On May 7, 2012, Karl G. Hursey, Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment of Plaintiff. As to Plaintiff's understanding and memory, Dr. Hursey found there was no evidence of limitation in her ability to remember locations and work-like procedures or ability to understand and remember very short and simple instructions. Plaintiff's ability to understand and remember detailed instructions was not significantly limited (R. 240).

As to Plaintiff's abilities to sustain concentration and persistence, Dr. Hursey found there was

no evidence of limitations in the following: carry out very short, simple, or detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; and make simple work-related decisions. Plaintiff's ability to perform activities within a schedule, maintain regular attendance, be punctual with customary tolerances, and sustain an ordinary routine without special supervision was not significantly limited (R. 240). Plaintiff was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods (R. 241).

As to Plaintiff's social interaction, Dr. Hursey found Plaintiff was not significantly limited in her ability to interact appropriately with the general public, accept instructions, respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them, exhibit behavioral extremes, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. Dr. Hursey found Plaintiff exhibited no evidence of limitations in her ability to ask simple questions or request assistance (R. 241).

In the adaption category, Dr. Hursey found Plaintiff was not limited in her ability to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places, and use public transportation. Plaintiff was not significantly limited in her ability to respond appropriately to changes in the work setting, set realistic goals, or make plans independently of others (R. 241).

Dr. Hursey noted Plaintiff had "some mild and moderate limitations across functional and adaptive domains resulting in a severe impairment. However, these limitations [did] not meet nor (sic) equal a listing. It appear[ed] that [Plaintiff] retain[ed] the capacity to engage in work-like activity consistent with the SGA. The MRFC is reduced as follows: [Plaintiff] can complete tasks

at a slower pace with regular scheduled breaks" (R. 242).

Dr. Hursey, also on May 7, 2011, completed a Psychiatric Review Technique of Plaintiff. He found her affective disorder was major depressive disorder (R. 247). Plaintiff's anxiety-related disorder was PTSD, chronic and mild (R. 249). Dr. Hursey found Plaintiff had mild limitations in her activities of daily living, mild restrictions in her ability to maintain social functioning, and moderate limitations in her ability to maintain concentration, persistence, and pace (R. 254). In making these findings, Dr. Hursey relied on Mr. McCauley's October 4, 2010, and January 25 and 29, 2011, counseling notes; Plaintiff's Functional Report - Adult; and Dr. Stein's Adult Mental Profile. Dr. Hursey noted he had requested Plaintiff's records from Dr. Goodykoontz, but "no response to the request" was received. Dr. Hursey found the "MER appears to be generally consistent with [Plaintiff's] allegations and overall the allegations are found to be generally credible. As to self care, Dr. Hursey noted that Plaintiff "carrie[d] out ADLs and household chores albeit with some difficulty." Relative to Plaintiff's social functioning, Dr. Hursey noted that she "struggle[d] to manage basic social interactions or relationships effectively. [Plaintiff] [was] able to leave home when needed, for example to manage shopping or appointments." Dr. Hursey found the following, relative to Plaintiff's cognition: "[Plaintiff] appear[ed] to have relatively frequent functional difficulties d/t cognitive problems (C/P/P). Pace [was] moderately slow. [Plaintiff] appear[ed] able to learn and recall basic information adequately for routine activities. [Plaintiff] [was] deemed by CE to be capable of handling personal finances adequately." Dr. Hursey further noted that "[Plaintiff] show[ed] functional limitations d/t mental/emotional factors[;] however[,] these impairments [did] not meet or equal the DDS requirements for the listing" (R. 256).

On July 18, 2011, Dr. Polizos found no "[n]ew [m]edical information" was in Plaintiff's file

that "indicate[d] a mental deterioration of" Plaintiff's "functionality" and adopted and affirmed Dr. Hursey's May 7, 2011, findings (R. 258).

Dr. Toni Goodykoontz, a psychiatrist, completed a Mental Residual Functional Capacity Questionnaire of Plaintiff on August 18, 2011. Dr. Goodykoontz noted she had begun treating Plaintiff nine (9) months earlier and treated Plaintiff every four (4) to six (6) weeks. Dr. Goodykoontz listed Plaintiff's Axis I diagnoses as bipolar affective disorder and Axis II diagnosis as personality disorder. Dr. Goodykoontz listed "pregnancy" as Axis III; multiple pregnancies, "relative issues," history of depression and "economics" as Axis IV. Dr. Goodykoontz found Plaintiff's current GAF was forty (40) and her highest GAF in the past year was sixty (60). Dr. Goodykoontz noted Plaintiff medicated with Prozac and had no side effect therefrom. Dr. Goodykoontz listed depression with fluctuating episodes of irrational and manic moods as the clinical findings, which included the "results of mental status examination," that "demonstrated" Plaintiff's mental impairment and symptoms. Dr. Goodykoontz found Plaintiff's prognosis was "guarded" (R. 262). Dr. Goodykoontz listed the following as Plaintiff's signs and symptoms: anhedonia or pervasive loss of interest of almost all activities; decreased energy; thoughts of suicide; feelings of guilt or worthlessness; difficulty thinking or concentrating; persistent disturbances of mood or affect; emotional withdrawal or isolation; bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes); hyperactivity; motor tension; emotional lability; manic syndrome; easy distractibility; and sleep disturbance (R. 263).

Dr. Goodykoontz's made the following findings as to Plaintiff's mental abilities and aptitudes needed to do unskilled work: her ability to be aware of normal hazards and take appropriate

precautions was limited, but satisfactory; she was unable to meet competitive standards of unskilled work because of her mental abilities and aptitudes to understand, remember, and carry out very short and simple instructions; her ability to ask simple questions or request assistance were seriously limited, but not precluded; Plaintiff was unable to meet competitive standards of unskilled work due to her limited ability to remember work-like procedures, maintain attention for two (2) hour segments, make simple, work-related decisions, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; Plaintiff had no useful ability to function at unskilled work due to her limitations in maintaining regular attendance, being punctual within customary, usually strict, tolerances, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being unduly distracted, completing a normal workday and workweek without interruptions from psychologically based symptoms, responding appropriately to changes in a routine work setting, and dealing with normal work stress. Dr. Goodykoontz did not "explain limitations falling in the three most limited categories [seriously limited, but not precluded; unable to meet competitive standards; and no useful ability to function]" or "include the medical/clinical findings that support this assessment"; she left this section blank (R. 264).

As to Plaintiff's abilities and aptitudes to do semi-skilled and skilled work, Dr. Goodykoontz found she was unable to meet competitive standards relative to understanding and remembering instructions and carrying out detailed instructions. Plaintiff had no useful ability to function as to setting realistic goals, making plans independently of others, and dealing with stress of semi-skilled and skilled work. Dr. Goodykoontz did not "explain limitations falling in the three most limited categories [seriously limited, but not precluded; unable to meet competitive standards; and no useful

ability to function]" or "include the medical/clinical findings that support this assessment"; she left this section blank (R. 265).

Relative to Plaintiff's mental abilities and aptitudes needed to do particular types of jobs, Dr. Goodykoontz found Plaintiff was limited, but satisfactory, in using public transportation; seriously limited, but not precluded, in her abilities to interact appropriately with the general public, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness; and unable to meet competitive standards in traveling in unfamiliar places (R. 265). Dr. Goodykoontz "explain[d] limitations falling in the three most limited categories [seriously limited, but not precluded; unable to meet competitive standards; and no useful ability to function] and include[d] the medical/clinical findings that support this assessment" as follows: "Patient currently pregnant . . . has limited use of medicine" (R. 265).

Dr. Goodykoontz found Plaintiff did not have a low IQ; Plaintiff's psychiatric condition did not exacerbate pain or physical symptoms (R. 265). Dr. Goodykoontz found Plaintiff would be absent from work more than four (4) days per month due to her impairments and treatments. Dr. Goodykoontz found Plaintiff's impairment "lasted or can . . . be expected to last at least twelve months." According to Dr. Goodykoontz, Plaintiff was not a malinger and her impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation. Dr. Goodykoontz further found that Plaintiff's chronic mood disorder and poor reaction to stress were additional reasons she would have difficulty working at a regular job on a sustained basis. Dr. Goodykoontz found Plaintiff could manage her own finances (R. 266).

Administrative Hearing

At the administrative hearing, Plaintiff testified she lived with her husband and their six (6)

children, whose ages ranged from seven (7) months to sixteen (16) years. Plaintiff's mother lived in the home for "about five or six months out of the year" (R. 35). Plaintiff testified she lived in a five (5) bedroom, two-story home (R. 36). Plaintiff stated her husband was a retired state police officer; he received a pension. They received WIC benefits (R. 39). Plaintiff stated she had two degrees – licensed practical nurse and registered nurse (R. 37). She received her degree in licensed practical nursing from McDowell County Vocational School and her registered nursing degree from Davis & Elkins College. Plaintiff testified her registered nursing license expired in October, 2011 (R. 38). Plaintiff stated she last worked as a registered nurse at St. Joseph's Hospital in the obstetrics department, a job she held for "a little short of a year" (R. 40). Prior to that job, she was a registered nurse in the obstetrics department at United Hospital Center for three (3) or four (4) weeks (R. 40-41). She "stopped" that job due to anxiety and depression. Plaintiff had earlier worked in the obstetrics department at Monongalia General Hospital (R. 41). Plaintiff had earlier worked in the emergency and obstetric departments at Davis Memorial Hospital for seven (7) or eight (8) years (R. 41-42). Plaintiff testified she also had past work at a clinic as a registered nurse and as a licensed practical nurse at McDowell Nursing and Rehabilitation and Cabell Huntington (R. 43).

Plaintiff stopped working at her last job because "Dr. Goodykoontz put [her] off work because [she] had called [her] family doctor and told him [she] was suicidal." Her family doctor referred her to counseling with Mr. McCauley, and he "set up an appointment with" Dr. Goodykoontz. Plaintiff testified that Dr. Goodykoontz would not "let" her go back to work, which caused her employer to "discontinue [her] position or discharge [her]" (R. 51-52).

Plaintiff testified she had a valid driver's license; she "rarely" drove (R. 36). Plaintiff described her typical day as follows: woke, changed her baby, fed her baby, "we kind of [sat] around

there and flip through the TV, play[ed] with the baby." Plaintiff stated she did not "really want to say mope, but [she was] just kind of there" (R. 48). Plaintiff testified that when she was in her depressed mode, her husband took the children to school and attended school functions. Plaintiff's husband "[did] dinner" and usually made breakfast or lunch (R. 48-49). He did most of the cleaning and cooking. Plaintiff did not "like going out or whatever"; she stayed "inside [her] quarters, inside [her] hole." She had her "pajamas on all day." She showered at night. Plaintiff testified that when she was in her "hyper mode," she wanted "to clean the whole house in one day" (R. 49).

Plaintiff stated her husband helped the children get ready for school "most of the time." Plaintiff testified that she assisted the school-aged children with their homework "sometimes," but it "depend[ed] on which mood [she was] in." Plaintiff's husband "generally" assisted the children with their homework (R. 49). Plaintiff stated her husband did "all of the cooking." Plaintiff's husband did "most of" the housework, laundry, vacuuming, and dusting; however, she occasionally completed those tasks, depending on her mood. Plaintiff testified that if she is in her "hyper mode or [her] racing mood, where [her] mind [was] just going really fast," she would be "up and doing things" and she could not "stop until those things [were] done." She stayed up "more than 24 hours cleaning . . . because that [was] what her mind [was] set on right then." She reported she had done "as many as 10 loads of laundry and put them all away. Straightened all the kids' drawers up as [she] put them away." When she was in her "depressed mood," she remained in bed; got out of bed just to go to the bathroom; and did not "even eat or anything." To "spend time with" her, the children would sit on the bed and watch television (R. 50).

Plaintiff testified that, while she was pregnant, her medication was limited. After she gave birth to her child, who was seven (7) months old at the time of the hearing, she resumed taking

medication, including Trazodone, Klonopin, Zoloft, and Ativan when she was not taking Klonopin. The ALJ asked Plaintiff if her taking these medications "help[ed] better than when you weren't able to take the medications"; she responded, "It helps. It, it helps." Plaintiff stated, with the medications, she had "times that [she felt] depressed, unmotivated, and [could not] concentrate on normal tasks, or even things that [she liked] to do." She could not watch a "show all the way through" for "like, an hour" (R. 47). She did not crochet. When she felt tired or depressed, she did not "have the energy." Plaintiff stated her depression lasted "sometimes three or four days. Sometimes three or four weeks. And then it goes from that to the – can't sleep." Plaintiff stated her mind would "spin[] around real fast." She would be "[r]eally hyper." This would last "three or four days, sometimes." Then Plaintiff would "just, like, crash and sleep." These symptoms were "not as bad as when [she] couldn't take medication." Without medication, Plaintiff was "more suicidal." Her periods of anxiety and depression "were more intense." With medication, Plaintiff's anxiety and depression were "still there," "but not as intense" (R. 48). The duration was "somewhat better" with medication. The frequency of her "swings were "just as frequent" (R. 50-51).

Plaintiff stated the side effects of her medication were she was "groggy." Plaintiff testified she did not take Klonopin and Trazodone together every day "because of [her] kids." When she did, she could sleep no more than two (2) hours per day (R. 52). This would "happen for, like, three or four days in a row. And then[,] at the end of that three or four days, [she would] just crash and . . . be out for, like 18 to 20 hours." During those eighteen (18) to twenty (20) hours, Plaintiff testified she would not wake up; she was "non-functional" (R. 53).

Plaintiff testified was "actually suicidal" and "actually had a plan" in August, 2011 (R. 52).

Plaintiff testified her hyper symptoms caused her to be "irritated easily" at work. People "annoyed [her] faster." It was "harder for [her] to deal with [her] co-workers when they were . . .

acting silly." In her hyper mode, she could not "think straight . . . sometimes." She would forget how to use certain equipment, especially if she did not "deal with [it] every day." In her depressed mode, Plaintiff testified she did not "have the energy to . . . think." "It's like [she] didn't even care." She made herself go to work because she had to go (R. 54).

Plaintiff testified she left her home to attend doctor's appointments. Plaintiff testified that when her three (3) year old son was born, he was hospitalized for one month in Morgantown. She did not "leave [her] home but a handful of times, honestly, five times or less in over a year. [She] did not leave at all. [She] was afraid that something would happen." Plaintiff stated her mother had several siblings who died in a five (5) year period of time, all before they reached the age of fifty (50). Plaintiff stated that she "started feeling like . . . if [she] left, [she] increased [her] chances of dying and that [she] got to spend less time with [her] kids. So, . . . if [she] stayed home, . . . [her] life was more protected. Their life (sic) was more protected, so [she] felt more secure." Plaintiff testified she went to her niece's home for Thanksgiving dinner; she went to her sister's home for Christmas (R. 55). Plaintiff testified that, when they moved to North Carolina, she drove a truck to Irving, NC, and back; that was the only time she drove in fourteen (14) months (R. 55-56). Plaintiff stated she insisted that her husband install a security system because she "had to protect [herself] so that [she] could see [her] kids" (R. 56).

Plaintiff testified that her symptoms for PTSD were anxiety and depression. She felt anxiety "when [her] son was . . . born" because she thought he "was going to die." The second "time [was] when [she] was at work and [they] had had three bad babies in a row. . . . [B]abies that were sick that (sic) had to be resuscitated in some way." Plaintiff testified that during the "week before [her] last day of work," a baby had "coded . . . for over an hour" and later died at a hospital in Morgantown,

West Virginia Plaintiff testified she was "devastated" by this (R. 56). She stated that it was at this time that she because "really anxious and really, really depressed to the point that [she] convinced [herself] that [her children]. . . would do better off without [her]." Plaintiff testified that it had been her rationale that she had to "be there" for her children, but, during this time, she "decided that they would be better off if they had someone more motivated and less depressed" (R. 57).

Plaintiff testified she received counseling from Mr. Mccauley "two or three days a week at Life Reflections" and "saw [Dr. Goodykoontz] every other week . . ." (R. 51).

The ALJ asked the VE the following hypothetical question:

> Would you assume a hypothetical individual of the same age, education, and work experience as the claimant who retains the capacity to perform work at all exertional levels with the following non-exertional limitations. The work should be limited to simple, routine, and repetitive one-to-two step tasks involving only simple instructions in a low-stress environment, defined as having only occasional decision-making required. Only occasional changes in the work setting. And no fast-paced or production line-type work. And there should be no more than occasional interaction with the public, supervisor, and co-workers. Could this hypothetical individual perform any of the past work of the claimant as actually performed or as customarily performed per the DOT? (R. 61).

The VE responded that such a hypothetical individual could perform the work of cleaner and hand packager (R. 61). When asked if such a hypothetical person could perform jobs in the national and regional economies if she had the limitations listed by Dr. Goodykoontz in her Mental Residual Functional Capacity Questionnaire, the VE responded that there would be no jobs (R. 62-64).

At the conclusion of the hearing, the Plaintiff volunteered that she missed working. She stated her doctors kept "putting [her] off work and so did [her] family." She testified nursing was stressful. She stated it made her "mood swings worse" and that she did not "notice them being as bad now that [she had been] home." Plaintiff testified that "things happened that [threw her] into

23

a really bad depression or anxiety" while she had been home and not working, but "it was definitely worse when [she was] working" (R. 66).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Swayze made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act at least through December 31, 2015 (Exhibit 2D13).

2. The claimant has not engaged in substantial gainful activity since October 1, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*)

3. Since October 1, 2010, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited her ability to perform basic work activities for a period of at least 12 consecutive months: Posttraumatic Stress Disorder; Major Depressive Disorder; Anxiety; Bipolar Disorder; Personalty Disorder; and "Non-Severe" Insomnia. (20 CFR 404.1520(c)) (R. 11).

4. Since October 1, 2010, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR part 404, Subpart P, Appendix 2 (20 CFR 404.1520(d), 404.1525 and 404.1526) (R. 12).

5. Since October 1, 2010, the claimant had at least the Residual Functional Capacity to perform, without impairment-related exertional limitation, a range of work activity that: entails work limited to simple, routine and repetitive, one to two-step tasks involving only simple instructions in a low stress environment defined as having only occasional decision making required, only occasional changes in the work setting, and no fast-paced or production line type of work; and entails no more than occasional interaction with the public, supervisor, and co-workers (R. 13).

6. Since October 1, 2010, the claimant has been unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on November 17, 1972[,] and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (Exhibits 1E, 8E, and 9E) (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English. (Exhibit 3E3) (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)) (R. 18).

11.     The claimant has not been under a continuing disability, as defined in the Social Security Act, from October 1, 2010, through the date of this Decision (20 CFR 404.1520 (g)) (R. 19).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were

the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1.    The ALJ erred because he failed to properly consider Dr. Goodykoontz's opinion.

2.    The ALJ erred because he failed to provide valid reasons supporting the unfavorable credibility finding.

The Commissioner contends:

1.    Plaintiff failed to meet her burden of proving that she was disabled under the act.

2.    The ALJ followed the controlling regulations in evaluating the opinion evidence.

3.    The ALJ followed the controlling regulations in finding Plaintiff's complaints not entirely credible.

## C. Treating Physician

Plaintiff alleges the ALJ erred because he failed to properly consider Dr. Goodykoontz's opinion. Plaintiff specifically asserts the ALJ is required to set forth in his decision a discussion of each of the factors contained in 20 C.F.R. §§ 404.1527(d) and 416.927(d)[3], but failed to do so; erred

---

[3]20 C.F.R. §§ 404.1527(d) and 416.927(d) were modified on August 24, 2012, which changed the numbering of the regulation. 20 C.F.R. §§ 404.1527(d) and 416.927(d) are now 20 C.F.R. §§ 404.1527(c) and 416.927(c).

by not citing evidence to support his assertion that Dr. Goodykoontz "put too great of weight on the claimant's subjective statements"; and erred in his rejection of Dr. Goodykoontz's opinions in their entirety because Dr. Goodykoontz found Plaintiff was unable to work (Plaintiff's brief at pp. 6-7). Defendant contends the ALJ followed controlling regulations in his evaluation of Dr. Goodykoontz's opinion (Plaintiff's brief at pp. 9-11).

Title 20 C.F.R. §§ 404.1527(c) and 416.927(c) govern how the Commissioner is to weigh medical evidence. It mandates the following:

> (c) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
>> (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>>
>> (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.
>>
>>> (i) *Length of the treatment relationship and the*

*frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. . . .

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

Further, Social Security Ruling 96-2p specifically addresses the ALJ's duty of explanation

when a treating source opinion is not given controlling weight:

[T]he . . . decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

The ALJ analyzed Dr. Goodykoontz's opinions as follows:

. . . . [T]he opinions and conclusions of Dr. Goodykoontz are accorded little weight. On February 20, 2011, Toni Goodykoontz, M.D., indicated that the claimant was under her care and had a severe mood disorder. This doctor opined that the claimant

needed to be off from work for an indefinite period of time and was unable to be employed at this time. (Exhibit 4F). It is noted that on August 18, 2011, Dr. Goodykoontz rendered a medical source statement in which she opined that the claimant would miss more than four days per month from work. More specifically, this doctor noted the claimant to have diagnoses of bipolar affective disorder and personality disorder and accorded her a current GAF score of 40 and a highest GAF score in the past year of 60. This doctor reported the claimant to have symptoms including "Anhedonia or pervasive loss of interest in almost all activities," "Decreased energy," "Thoughts of suicide," "Feelings of guilt or worthlessness," "Difficulty thinking or concentrating," "Persistent disturbances of mood or affect," "Emotional withdrawal or isolation," "Bipolar syndrome," "Hyperactivity," "Motor tension," "Emotional lability," "Manic syndrome," "Easy distractibility," and "Sleep disturbance." This doctor further opined the claimant to have either no useful ability to function or was unable to meet competitive standards in most facet (sic) of mental abilities and aptitudes needed to do unskilled work, semiskilled work, or skilled work. She further opined that the claimant was unable to meet competitive standards in traveling to unfamiliar places (Exhibit 11F). The undersigned concludes that such findings are inconsistent with the ongoing daily activities conducted by the claimant as described above. Second, from examining the full record, this doctor appears to have placed too great of weight on the claimant's subjective statements, and overstated her limitations. Finally, the Administrative Law Judge believes that Dr. Goodykoontz's conclusions as to the claimant's limitations are overly severe and inconsistent with the full longitudinal record. Further, although this source did have the opportunity to examine and treat the claimant, the opinions offered were not supported with a sufficient rationale and the record does not support the number of functional areas said to have no useful ability, and this opinion does not reflect familiarity with the SSA disability program. Finally, to the extent that it opines on the ultimate issues of disability, these opinions tread on an issue reserved for the Commissioner. Ultimately, the opinions and conclusions of Dr. Goodykoontz are accorded little weight (R. 16-17).

The ALJ's decision was "sufficiently specific to make clear . . . the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Id. at *5. See *Pinson v. McMahon*, 3:07-1056, 2009 WL 763553 (D.S.C. Mar. 19, 2009) (holding the ALJ properly analyzed the treating source's opinion even though the ALJ failed to list the factors listed in Title 20 C.F.R. §§ 404.1527(c) and 416.927(c) or specifically address each one). The undersigned finds the ALJ in the instant case properly and thoroughly weighed and evaluated Dr. Goodykoontz's opinion when

assigning it weight. As noted above, the opinion of a treating physician will be given controlling weight only if that opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence. See 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c). "Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). In his decision, the ALJ found Dr. Goodykoontz's opinion was "inconsistent with the full longitudinal record" and was not supported by the record (R. 17). He made specific reference to the following:

- Plaintiff discussed family stress with Mr. McCauley on October 1, 2010. Plaintiff's mood and affect were labile and her behavior was impulsive; however, her flow of thought was normal and her judgment and insight were fair and good. She was diagnosed with major depressive disorder (R. 14-15).

- Plaintiff reported she experienced stress, depression, suicidal ideations, occasional vomiting, headaches, and migraine headaches to Dr. Roberts on October 4, 2010. He prescribed Klonopin and Prozac and diagnosed depression and anxiety (R. 15).

- During her October 11, 2010, counseling session, Mr. McCauley observed Plaintiff to be impulsive with anxious mood and affect; however, her flow of thought was tangential (R. 15).

- Plaintiff discussed work stress with Mr. McCauley on October 14, 2010. Plaintiff was observed to have labile mood and affect and impulsive behavior; her judgment was good and her insight was fair (R. 15).

- Plaintiff's mood and affect were anxious and her behavior was impulsive during her October 19, 2010, counseling session with Mr. McCauley; however, her judgment was fair and her insight was good (R. 15).

- On October 20, 2010, Plaintiff reported to Dr. Roberts that she had increased stress at work; she stated she was depressed and anxious and experienced headaches, nausea and vomiting. Dr. Roberts found Plaintiff was anxious and was "subject to Posttraumatic Stress Disorder" (R. 15).

- On October 25, 2010, Plaintiff focused on marital stress during her counseling

session with Mr. McCauley. He found her mood to be anxious; however, her behavior was normal, her insight was good, and her judgment was fair (R. 15).

● Mr. McCauley counseled Plaintiff relative to stress on November 1, 2010. Her behavior was found to be impulsive; however, her mood and affect were normal, her thought flow was tangential, and her insight was good (R. 15).

● Plaintiff's mood and affect were depressed during her November 9, 2010, counseling session with Mr. McCauley; however, her behavior was normal (R. 15).

● Dr. Roberts diagnosed Plaintiff with depression, anxiety, and insomnia based on her statements to him on November 19, 2010 (R. 15).

● Plaintiff discussed "poor communication" with Mr. McCauley on December 2, 2010. Her mood and affect were depressed and her behavior was negative (R. 15).

● Mr. McCauley found Plaintiff's mood and affect were anxious and her behavior was impulsive during her December 7 and 14, 2010, counseling sessions with him. Plaintiff's insight, however, was found to be fair and her judgment was good (R. 15).

● Plaintiff was fidgety during her January 4, 2011, counseling session with Mr. McCauley. Her mood and affect were irritable and her behavior was demanding and negative; however her insight and judgment were fair (R. 15).

● Plaintiff reported anxiety and nausea to Dr. Roberts on January 25, 2011. She was diagnosed with depression, anxiety, and insomnia. She was pregnant (R. 15-16).

● Mr. McCauley found Plaintiff's mood and affect were labile, behavior was negative and impulsive, and insight and judgment were fair during her January 25, 2011, counseling session with him (R. 16).

● As a result of a May 2, 2011, consultative examination, Dr. Stein found Plaintiff's affect was subdued. She had no thought processing disturbances, delusions, preoccupations, obsessions or phobias. He found Plaintiff was at mild risk for suicide based on her statements. Dr. Stein found her immediate and recent memory was normal and her remote memory was mildly deficient. Plaintiff was mildly deficient in her social interaction with him. Her concentration was within normal limits, pace was moderately slow, and persistence was mildly deficient (R. 16).

Additionally, the ALJ gave significant weight to the opinions of Dr. Hursey, who completed

a May, 2011, Mental Residual Functional Capacity Assessment of Plaintiff, and the opinion of Dr.

Polizos, who affirmed that opinion in July, 2011. The ALJ found the following:

> The Administrative Law Judge has accorded significant weight . . . to the May 2011 Mental Residual Functional Capacity Assessment and July 2011 affirmation respectively completed by State Agency Medical Consultants, Drs. Hursey and Polizos, in which it was opined that the claimant experienced no more than moderate limitations with regard to facets of "Understanding and Memory," "Sustained, (sic) Concentration, (sic) and Persistence," "Social Interaction," and "Adaptation." More specifically, Dr. Hursey opined that the claimant "can complete tasks at a slower pace with regular scheduled breaks." (Exhibit 6F3). In affirming the aforesaid assessment, Dr. Polizos opined that the claimant was generally able to work and she had only "mild to moderate" limitations of functionality. (Exhibit 8F).

The ALJ was correct in considering the opinions of the state-agency physicians. "[A]dministrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence . . . ." See 20 CFR § 404.1527(e)(2)(i). His finding that their opinions are "balanced, objective, and consistent with the evidence of record as a whole" is supported by the evidence as evaluated and discussed and by the ALJ. Conversely, the opinions of Dr. Goodykoontz are inconsistent with the above noted evidence.

The undersigned finds Plaintiff's contention that the ALJ assigned little weight to the opinions of Dr. Goodykoontz because she "placed too great of weight on the claimant's subjective statements, (sic) and overstated her limitations" is unsupported (Plaintiff's brief at p. 6). As noted above, the ALJ based the weight he gave to the opinion of Dr. Goodykoontz on those opinions being inconsistent with the evidence, inconsistent with Plaintiff's activities, and not supported by the evidence of record. The ALJ noted, based on *his* having "examin[ed] the full record," that Dr. Goodykoontz "appear[ed] to have placed too great of weight on the claimant's subjective statements" (R. 17). The record, as thoroughly reviewed and evaluated by the ALJ, contains the following "subjective" complaints of Plaintiff:

*Function Report*: Plaintiff could not "deal with" work stress; was unable to sleep, concentrate, or focus; sat "around"; "stay[ed] in bed"; experienced no interest in anything; felt everything was a "task"; felt "everything [was] a conscious effort out of guilt or obligation"; did not go outside due to stress and anxiety; felt worthless; had no "energy to think" about paying bills; cleaned, washed clothes, and washed dishes when she was not depressed and had energy; rarely crocheted or watched television; "hate[d] phone"; did not talk to family members often; had difficulty "getting along" with others; could not be "around people"; was frightened "something" would happen to her if she left her home; did not finish projects; could follow instructions "okay"; had been fired from her job due to depression, anxiety and inability to work with others; had been fired from a subsequent job because she could not "make" herself go to work; became angry, depressed and could not function when she felt stress; had a fear of dying; "became nonfunctional . . . if working"; and felt it was "impossible for [her] to work" (R. 14, 172-79).

*Dr. Roberts*: Plaintiff reported she was depressed, stressed, and overwhelmed and had suicidal ideations on October 4, 2010 (R. 15, 211).

*Dr. Roberts*: On October 20, 2010, Plaintiff reported she had a "melt down" and increased work stress. She was unable to sleep (R. 15, 212).

*Dr. Stein*: Plaintiff reported she could not work as a nurse due to depression, "[d]espite medicines and regular therapy"; had suicidal thoughts; had "lots" of anxiety"; had "zero" income; had difficulty falling asleep; woke frequently; cried four (4) or five (5) times per week; had poor energy; had recent and past suicidal ideation, but no plan; had two (2) panic attacks per month; had compulsive behaviors; had been sexually abused as a child and teen; did no yard work; rarely shopped; did not walk; did not read; rarely ate in restaurants; needed reminded to go places; rarely attended church; rarely visited friends; and occasionally sat on her porch (R. 16, 235-38).

Dr. Goodykoontz's findings mirror these complaints. She found Plaintiff had anhedonia or pervasive loss of interest of almost all activities; decreased energy; thoughts of suicide; feelings of guilt or worthlessness; difficulty thinking or concentrating; persistent disturbances of mood or affect; emotional withdrawal or isolation; bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes; hyperactivity; motor tension; emotional lability; manic syndrome; easy distractibility; and sleep disturbance (R. 16, 263).

Dr. Goodykoontz found Plaintiff was seriously limited in her ability, unable to meet competitive standards, and had no useful ability to perform <u>unskilled work</u>. Dr. Goodykontz found Plaintiff was unable to meet competitive standards and had no useful ability to do <u>semi-skilled and skilled work</u>. Dr. Goodykoontz found Plaintiff was seriously limited in her ability and was unable to meet competitive standards required to do <u>particular types of jobs</u> (R. 16, 264-65).

A review of the August 18, 2011, Mental Residual Functional Capacity Questionnaire completed by Dr. Goodykoontz, which contains the above listed findings, shows that she did not "attach relevant treatment notes and test results" to the questionnaire that support her finding. "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion." <u>See</u> 20 C.F.R. § 404.1527(c)(3). Except for prescribing Prozac to Plaintiff, Dr. Goodykoontz did not list any treatments she provided Plaintiff or the results of those treatments. In the "Mental Abilities and Aptitudes Needed to do Unskilled Work" category, Dr. Goodykoontz, on line "(Q)," was asked to "Explain limitations falling in the three most limited categories . . . and include the medical/clinical findings that support this assessment." She did not list or include any medical/clinical findings that supported her opinions (R. 264). In the "Mental Abilities and Aptitudes Needed to do Semiskilled and Skilled Work" category, Dr. Goodykoontz, on line "(E)," was asked to explain Plaintiff's limitations and include supporting medical and clinical findings. Again, she did not list or include any medical/clinical findings that supported her assessment (R. 265). In the "Mental Abilities and Aptitudes Needed to do Particular Types of Jobs" category, Dr. Goodykoontz, on line "(F)," was asked to explain Plaintiff's limitations and provide medical and/or clinical findings to support her findings. She wrote as follows: "patient currently pregnant which has limited use of medicine" (R.

265). Dr. Goodykoontz did list, as a "clinical finding," that Plaintiff had been diagnosed with "depression [with] fluctuating episodes of irritation [and] manic mood.," but she did not include the results of a mental status examination to support it. In light of the parallels between Plaintiff's statements and Dr. Goodykoontz's findings and the absence of any medical or clinical findings listed on or attached to the questionnaire by Dr. Goodykoontz to support her opinions, the ALJ's rationale that it "appear[ed]" that Dr. Goodykoontz "placed too great of weight on" Plaintiff's "subjective statements" is not implausible or unsupportable.

Finally, Plaintiff 's contention that the ALJ erred in his rejection of Dr. Goodykoontz's opinion in its entirety because Dr. Goodykoontz found Plaintiff was unable to work lacks merit. As noted above, the ALJ did not reject Dr. Goodykoontz's opinion; he assigned little weight to her opinions because he found they were inconsistent with the record, inconsistent with Plaintiff's statements, "appear[ed]" to be based on Plaintiff's subjective statements, were not supported by the record, and, "to the extent that it opines on the ultimate issue of disability, these opinions tread on an issue reserved to the Commissioner" (R. 17). The opinion expressed by Dr. Goodykoontz relative to Plaintiff's disability is an issue reserved to the Commissioner because it is an administrative finding that is dispositive of a case; *i.e.*, that would direct the determination or decision of disability. A statement by a medical source that a claimant is "disabled" or "unable to work" does not mean that the Commissioner will determine that the claimant is disabled. See 20 C.F.R. § 404.1527(d). 20 C.F.R. § 404.1527(d)(3) expressly provides that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." Such opinions of Dr. Goodykoontz cannot, therefore, be accorded controlling weight or even any special significance.

Accordingly, the undersigned finds that substantial evidence supports the weight assigned to Dr. Goodykoontz's opinions.

## D. Credibility

Plaintiff contends that the ALJ failed to provide valid reasons to support his unfavorable credibility finding. Specifically, Plaintiff alleges the ALJ erred in finding her incredible because she filed an application for Social Security benefits, because he cited only certain portions of the record and Plaintiff's testimony, and he "ignored the medical opinions addressing [Plaintiff's] credibility" (Plaintiff's brief at pp. 7-11). Defendant contends the ALJ's credibility finding is supported by the evidence of record (Defendant's brief at pp. 11-14).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in *Craig v. Chater*, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .
>
> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, See 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20

C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

*Craig*, supra at 594.

The ALJ found, in part, the following:

For all of the foregoing reasons and in view of the evidence cited, the Administrative Law Judge does not find the claimant to be entirely credible and does not fully accept the claimant's subjective statements concerning her symptoms and limitations, as purported to exist throughout the period at issue. The claimant has medically determinable impairments that could reasonably be expected to cause some of the symptoms described, and the undersigned believes that the claimant does experience symptoms related to such impairments, (sic) but not to the frequency or debilitating degree of severity alleged. In view of this determination concerning the claimant's credibility, the [ALJ] does not accept medical findings or opinions that are based solely or primarily upon the claimant's subjective complaints (R. 14).

A review of the ALJ's decision reveals he did not rely exclusively on Plaintiff's statements in his credibility finding. He relied on the factors contained in SSR 96-7p, which reads, in part, as follows:

PURPOSE: The purpose of this Ruling is to clarify when the evaluation of symptoms, including pain, under 20 CFR 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effect; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision. In particular, this Ruling emphasizes that:

1. No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.

2. When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to

determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

. . .

4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case records. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

SSR 96-7p further provides:

In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning the individual's

> functional limitations and restrictions due to pain or
> other symptoms.

SSR 96-7p, 1996 WL 374186, at *1, *3 (July 2, 1996).

The Fourth Circuit, in an unpublished opinion, has held that an ALJ's credibility determination is "virtually unreviewable by this court on appeal." *Darvishian v. Geren*, 404 Fed. Appx. 822, 831, 2010 WL 5129870, (C.A.4 (Va.) Dec. 14, 2010) (citing *Bieber v. Dept. of the Army*, 287 F.3d 1358, 1364 (Fed. Cir. 2002)). An ALJ's findings will be upheld if supported by substantial evidence. See *Milburn Colliery Co. v. Hicks*, 134 F.3d 524, 528 (4th Cir. 1998). The ALJ, as the fact finder, has the sole responsibility to weigh a claimant's complaints about her symptoms against the record as a whole. See 20 C.F.R. § 404.1529(c). The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984) (citing *Tyler v. Weinberger*, 409 F.Supp. 776 (E.D.Va.1976)). An ALJ "is not required 'to use particular format in conducting his analysis,' but the decision must demonstrate 'that there is sufficient development of the record and explanation of findings to permit meaningful review." *Moore v. Astrue*, 2010 WL 3394657, *6 n.12, (E.D.Va. July 27, 2010) quoting *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).

The ALJ, in his decision, sufficiently developed the record and explained his findings as he considered the factors in SSR 96-7p. The ALJ discussed, considered and weighed the objective evidence of record in making his credibility determination. He considered Dr. Hursey's opinion that Plaintiff had mild restrictions of activities of daily living, mild restrictions in social functioning, and moderate restrictions as to persistence, pace and concentration (R. 12). The ALJ considered Dr.

Hursey's opinion that Plaintiff could "complete tasks at a slower pace with regular scheduled breaks" (R. 17). The ALJ considered Mr. McCauley's findings that Plaintiff had labile affect and mood, impulsive behavior, but normal thought flow, fair judgment, and good insight on October 1, 2010; had impulsive and anxious mood but tangential thought flow on October 11, 2010; had labile mood and affect, impulsive behavior, but good judgment and fair insight on October 14, 2010; had anxious mood and affect, impulsive behavior, but fair judgment and good insight on October 19, 2010; had anxious mood and affect but normal behavior, good insight, and fair judgment on October 25, 2010; had impulsive behavior but normal affect and mood, tangential thought flow, and good insight on November 1, 2010; had depressed and anxious mood and affect but normal behavior on November 9, 2010; had depressed mood and affect and negative behavior on December 2, 2010; had anxious mood and affect, impulsive behavior, but fair insight and good judgment on December 7, 2010; was anxious and impulsive but had good judgment and fair insight on December 14, 2010; had irritable mood and affect, demanding and negative behavior, but fair insight and judgment on January 4, 2011; and had labile mood and affect, negative and impulsive behavior, but fair judgment and insight on January 25, 2011. The ALJ considered Mr. McCauley's diagnosis of major depressive disorder (R. 14-16). The ALJ considered Dr. Stein's opinion that Plaintiff had complained of suicidal thoughts and ideations, but had no plan and was a mild risk for suicide; had subdued affect; had no thought processing disturbances; had no delusions, preoccupations, obsessions, or phobias; had normal recent and immediate memory; had mildly deficient remote memory; was mildly deficient in her social interactions; had normal concentration; had mildly deficient persistence; and moderately slow pace (R. 16). The ALJ considered Dr. Robert's diagnoses of depression and anxiety on October 4, 2010; his finding that Plaintiff was "subject to Posttraumatic Stress Disorder" on October 20,

2010; his diagnoses of insomnia, depression, and anxiety on November 19, 2010; and his diagnosis that Plaintiff was pregnant and had insomnia, as well as depression and anxiety, on January 24, 2011 (R. 15-16). The ALJ adequately considered the evidence of record in making his credibility finding, and his finding that the objective medical evidence "fails to demonstrate the presence of a totally disabling condition which would render the claimant unable to engage in substantial gainful activity" is supported (R. 15-16).

The ALJ analyzed and discussed the location, duration, frequency and intensity of Plaintiff's symptoms. The ALJ considered Plaintiff's having undergone counseling from October, 2010, through January, 2011 (R. 14-16). The ALJ considered Plaintiff's PTSD, major depressive disorder, anxiety, bipolar disorder, and personality disorder severe impairments and her diagnosis of insomnia as non-severe (R. 11). The ALJ considered Plaintiff's discussions about work stress and marital stress with Mr. McCauley (R. 15). The ALJ, after consideration of the evidence, reduced Plaintiff's ability to work (R. 13). Accordingly, the undersigned finds the ALJ did consider the location, duration, frequency and intensity of Plaintiff's pain.

The ALJ considered that Plaintiff treated her symptoms with Klonopin and Prozac, as prescribed by Dr. Roberts (R. 15). The ALJ considered Dr. Goodykoontz's finding that Plaintiff had a GAF of forty (40) when she was pregnant and "unable to take any of her medications" and noted there was "no evidence of record to support the claimant's assertion that she continues to have such severe limitations now that she is back on her medication" (R. 17).[4] As noted above, the ALJ, in his analysis of the records of Mr. McCauley, Dr. Roberts, Dr. Hursey, Dr. Stein, and Dr.

---

[4]The ALJ did not note that Dr. Goodykoontz found Plaintiff had no side effect to Prozac (R. 262).

Goodykoontz, considered the treatment, other than medication, Plaintiff received for her symptoms (R. 14-17). The ALJ adequately considered non-medication type treatments and the type, dosage, effectiveness, and side effects of medication Plaintiff took to alleviate pain or other symptoms.[5]

The ALJ considered those factors that aggravated Plaintiff's symptoms in his analysis of Plaintiff's statements. Plaintiff's asserts the ALJ selectively cited the record as to Plaintiff's statements and primarily based his credibility finding on the fact that Plaintiff had applied for Social Security benefits, thereby causing her to have a "disincentive with regard to any return to work for a significant period of time after its filing" (Plaintiff's brief at p. 8). As discussed below, the ALJ adequately considered factors that aggravated Plaintiff's symptoms and Plaintiff's statements.

The ALJ found the following:

> In filing for disability benefits in February 2011, the claimant has alleged bipolar disorder, depression, and anxiety have limited her ability to sustain consistent employment since October 14, 2010. (Exhibit 3E2). Thus, all of the claimant's statements as to her impairments-related symptoms and limitations after February 2011, to medical practioners or made in conjunction with her disability applications, were offered within a context that included her underlying interest in obtaining related and contingent financial benefits. In the opinion of the Administrative Law Judge, the claimant's application for disability benefits would ostensibly operate to provide an appreciable disincentive with regard to any return to work for a signifcant period of time after its filing, as well as an incentive to thereafter articulate such ongoing symptomatology on relevant occasions as would be reasonably calculated to facilitate such an underlying financial claim (R. 13).

This was an opinion expressed by the ALJ, not a finding. As noted above, the ALJ complied with the mandate in SSR 96-7p relative in making his findings as to Plaintiff's credibility in that he

---

[5] The undersigned notes inconsistencies in Plaintiff's statements relative to Dr. Goodykoontz's care. Dr. Goodykoontz, in her medical statement, noted she treated Plaintiff every four (4) to six (6) weeks (R. 262). Plaintiff informed Dr. Stein that "she [saw] a psychiatrist once per month for medication management" (R. 236). Plaintiff testified she "saw [Dr. Goodykoontz] every other week . . ." (R. 51).

discussed the objective medical evidence; location, duration, frequency, and intensity of Plaintiff's symptoms; what non-medication treatments Plaintiff used to treat her symptoms; and the effects, including the side effects, of medication taken by Plaintiff. The ALJ, relative to Plaintiff's statements, found the following:

> The full longitudinal record of evidence readily demonstrates that the claimant's allegations of the disabling nature of her alleged impairments are significantly undermined by her daily activities. The claimant's activities do not comport with a person who is totally disabled. More specifically, it is noted that in a function report filed in conjunction with the claimant's application she noted that depression and anxiety resulted for her to be unable to deal with stress at work, to sleep, and concentrate/focus at times. Despite the aforementioned, the claimant reported that she was able to care for her children and her dog. She also indicted that she was able to care for her own personal care. The claimant also noted that she was able to engage in cleaning, do laundry, and cleaning dishes when she was not depressed. Overall, the claimant indicted that she rarely went shopping and did not spend time with others. She further noted that she had problems with her memory, completing tasks, concentration, following instructions, and getting along with others. (Exhibit 4E). However, on May 2, 2011, the claimant reported that she engaged in daily activities including maintaining her personal hygiene without assistance, occasionally cleaning, occasionally washing dishes, and occasionally doing laundry. During her normal day, the claimant reported that she would care for her personal hygiene, dress, feed her son, watch television, clean dishes, straighten up the house and kitchen, and complete laundry. Upon her children's return from school, she supervises their homework, makes their dinner, and then supervises their bath and bedtime routines. (Exhibit 5F4). Although reporting the aforementioned, the claimant inconsistently testified under oath at the April 2012 disability hearing that her typical day entailed getting up in the morning, eating, and laying around the house. The fact that a person can[,] in effect[,] do the aforementioned activities does not suggest total disability to the undersigned. Thus, under the circumstances, the credibility of the claimant's subjective allegations are substantially diminished (R. 14).

The ALJ adequately identified inconsistencies in Plaintiff's statements t. The ALJ did not engage in "selective citation" (Plaintiff's brief at p. 9); he reviewed Plaintiff's statements – those contained in the Function Report; those she made to Dr. Stein during her May 3, 2011, consultative examination and those she made at the April 12, 2012, administrative hearing.

The ALJ noted those tasks, listed in the Function Report, that Plaintiff wrote that she could

do. The ALJ discussed Plaintiff was able to care for her children, her dog, and her own personal care (R. 14). In that function report, Plaintiff noted she could clean, do laundry and wash dishes when she was not depressed. Plaintiff specifically asserts that the ALJ failed to consider how often Plaintiff's depression caused limitations. The ALJ clearly considered this. He wrote: . . . "it is noted that in a function report filed in conjunction with the claimant's application . . . that depression and anxiety resulted for her to be unable to deal with stress at work, to sleep, and concentrate/focus at times" (R. 14). Further, the ALJ relied on the opinions of the state-agency physicians in determining what work Plaintiff could do despite her limitations. Plaintiff wrote it was a "task for me to get up – make it through the day – get a shower and do what I can for the kids/house etc." She further qualified her ability to clean and do laundry by writing that she cleaned for thirty minutes and did two (2) or three (3) loads of laundry per day and then did no laundry for two (2) or three (3) days (R. 174-75). The ALJ considered those statements and noted she rarely shopped, rarely spent time with others, had "problems with her memory, completing tasks, concentration, following instructions, and getting along with others" (R. 14).

The ALJ considered the statements Plaintiff made to Dr. Stein on May 2, 2011. The ALJ expressly noted Plaintiff told Dr. Stein she maintained her personal hygiene without assistance, occasionally cleaned, washed dishes, and did laundry. Plaintiff informed Dr. Stein that, during a normal day, she fed her son, watched television, washed dishes, "straighten[ed]" up the house, cleaned the kitchen, completed laundry, supervised her children's homework when they returned from school, made their dinner, and supervised their baths and bed routines (R. 14). Plaintiff specifically asserts the ALJ did not consider her statements that she did not do yard work, rarely gardened, rarely grocery shopped, rarely ran errands, rarely drove, occasionally sat on the porch, and rarely read (Plaintiff's brief at pp. 10-11). The ALJ accommodated those statements in finding

Plaintiff had mild limitations in social functioning, mild limitations in activities of daily activities, and moderate limitation in her concentration/persistence/pace abilities (R. 12).

As to Plaintiff's testimony, the ALJ noted the following: "although reporting the aforementioned (statements written in Function Report and statements made to Dr. Stein), the claimant inconsistently testified under oath at the April 12, 2010[,] disability hearing that her typical day entailed getting up in the morning, eating, and laying around the house" (R. 14). Plaintiff specifically asserts the above statement is false; it is not. The ALJ did not mischaracterize Plaintiff's testimony; he wrote a synopsis of it to point to the inconsistencies between it and her statements on the Function Report and to Dr. Stein. That portion of Plaintiff's testimony, in its entirely, shows distinct inconsistencies:

> Get up. Change the baby, get her some food. My husband usually makes breakfast, or lunch, or whatever. And we kind of sit around there and flip through the TV, play with the baby. I kind of – I, I kind of just – I don't really want to say mope, but I'm just kind of there, you know? I don't really – my husband takes the kids to school. He goes to school functions. He does dinner. He does lunch. He does most of the cooking and cleaning. When I'm in my depressed mode and when I'm in my hyper mode, then I can go around and, you know, I want to clean the whole house in one day. And I want to – I don't leave the house very often. But I'll do things inside my – inside my quarters, inside my hole, I guess. But I, I just – I just don't like going out or whatever. I usually take a shower at night, then put my pajamas on. I have my pajamas on all day. I just kind of leave them on and just – you know, just not really motivated, I guess is the word (R. 48-49).

Again, there is no format in his written decision that the ALJ must follow as long as that decision demonstrates "sufficient development of the record and explanation of findings to permit meaningful review." *Moore*, supra at *6 n.12. The ALJ heard Plaintiff's testimony; he discussed it in his decision. Plaintiff, at the administrative hearing, testified that her husband cared for the children, cooked and cleaned and, at the most, she, when depressed, showered, minimally cared for her baby, and "[sat] around and flip[ped]" through the television channels. As noted by the ALJ, this

testimony is distinctly inconsistent with Plaintiff's statements made only a few months earlier.

Based on all of the above, the undersigned finds the ALJ's credibility determination is supported by substantial evidence.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **GRANTED**, and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _20_ day of _December_ 2012.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE